J-S75005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JUSTIN SCOTT MYERS | |
| Appellant | No. 175 WDA 2019 |

Appeal from the Judgment of Sentence Entered December 17, 2018
In the Court of Common Pleas of Erie County
Criminal Division at No.: CP-25-CR-0001453-2018

BEFORE:  STABILE, KUNSELMAN, and PELLEGRINI,* JJ.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 13, 2020**

Appellant Justin Scott Myers appeals from the December 17, 2018 judgment of sentence entered in the Court of Common Pleas of Erie County ("trial court"), following his jury convictions for strangulation, recklessly endangering another person ("REAP"), two counts of harassment, and criminal mischief.[1]  Upon review, we affirm.

The facts and procedural history underlying this case are undisputed. As recounted by the trial court:

> Appellant and the victim, Nicole Zimmer (Ms. Zimmer), were in an intimate relationship from approximately December 2015 through February 2018.  During their relationship the parties lived together and had a child.  Appellant and Ms. Zimmer broke up in approximately February [of] 2018 at which time Ms. Zimmer moved out of the couple's home and in with her parents.  The

---

* Retired Senior Judge assigned to the Superior Court.

[1]  18 Pa.C.S.A. §§ 2718(a)(1), 2705, 2709(a)(1), and 3304(a)(5), respectively.

parties began sharing custody of the minor child pursuant to a Custody Order.

On the evening of March 20, 2018, the child was at Appellant's home according to the custody schedule. Appellant and Ms. Zimmer, trying to work things out, made plans for Ms. Zimmer to come to the home and spend time together as a family until the child went to bed and then the adults would watch movies. Appellant and Ms. Zimmer put the child to bed around 8:00 p.m. and stayed up drinking beer and watching movies late into the night. Ms. Zimmer had approximately four or five Labatt Blues over the course of the night. Ms. Zimmer did not know how much Appellant had had to drink.

After the third movie, Appellant looked at Ms. Zimmer and said, "That's why you slept with my brother." At first Ms. Zimmer thought Appellant was joking but he began to get angry and screamed at her. Appellant threw an open beer can, hitting Ms. Zimmer and leaving a bruise on her chest. Ms. Zimmer left the room to clean herself off and Appellant walked toward her screaming. Appellant pinned Ms. Zimmer's back against the hallway wall, grabbed her around her neck, and squeezed. Ms. Zimmer could not breathe or escape from Appellant's grip. Right before Ms. Zimmer lost consciousness, Appellant released her and she collapsed on the floor. Appellant then grabbed Ms. Zimmer by her ankles, drug her to the front door, and threw her outside.

After a few minutes, Ms. Zimmer reentered the house to retrieve her purse, phone and car keys and then left the premises. Appellant began texting Ms. Zimmer apologizing and asking her to come back to talk. Ms. Zimmer returned to the home. Appellant had calmed down and the parties talked for ten to twenty minutes. Suddenly, Appellant became agitated again and left the property.

When Appellant didn't return after some time, Ms. Zimmer became worried and attempted to call his cell phone. When she called his phone number, Ms. Zimmer noticed Appellant's cell phone lighting up from the bedroom floor. Ms. Zimmer picked up the phone and looked at it, and found messages from other girls.

When Appellant finally returned home, Ms. Zimmer confronted him about the messages from other girls. The couple began arguing again and Appellant threw Ms. Zimmer's keys down the hallway where they shattered, and smashed her cell phone. Ms. Zimmer called Appellant a liar and slapped him. The next thing Ms. Zimmer remembered was waking up face-down on the floor with blood pouring out of her mouth and the feeling there was a hole in her mouth. Ms. Zimmer went into the bathroom to look in the mirror and found her jaw was cracked.

Appellant drove Ms. Zimmer to the emergency room. On the way to the hospital, Appellant told Ms. Zimmer they needed to make up a story of what had happened and instructed her to say she fell

down the steps. Appellant accompanied Ms. Zimmer in the examination room and when the physician asked her what had happened she complied with the made up story. The physicians at the emergency room confirmed Ms. Zimmer's jaw had been broken. Ms. Zimmer was sent to a specialist in Pittsburgh for surgery where metal plates were screwed into her jawbone and her jaw was wired shut to heal.

Ms. Zimmer reported the incident to the Millcreek Police Department on April 3, 2018. Appellant was charged with Aggravated Assault, Strangulation, [REAP], two counts of Simple Assault, two counts of Harassment, and Criminal Mischief.

On November 7, 2018, following a two-day jury trial, Appellant was convicted of: Strangulation, [REAP], Harassment (strike and/or shove and/or kick), Harassment (choke), and Criminal Mischief. The [c]ourt declared a hung jury as to the Aggravated Assault. [The charges for aggravated assault have been re-filed and disposition is currently pending.]

On December 17, 2018, Appellant was sentenced to an aggregate period of 40 months to 10 years as follows:

Count Two - Strangulation: 40 months to 10 years of incarceration.

Count Three – [REAP]: 12 months to 24 months of incarceration, concurrent to Count Two.

Count Six - Harassment (strike/shove/kick): 45 days to 90 days of incarceration, concurrent to Count Three.

Count Seven - Harassment (choke): 45 days to 90 days of incarceration, concurrent to Count Three.

Count Eight - Criminal Mischief: 45 days to 90 days of incarceration, concurrent to Count Three.

Trial Court Opinion, 5/23/19 at 1-4 (record citations and footnotes omitted).

On December 27, 2018, Appellant filed post-sentence motions, which the trial court denied on January 3, 2019. Appellant timely appealed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, challenging a plethora of evidentiary rulings made by the court during trial. In response, the trial court issued a detailed Pa.R.A.P. 1925(a) opinion.

On appeal,[2] Appellant presents five issues for our review, which we have reproduced verbatim.

> [I.] Did the trial court commit an abuse of discretion and/or error of law when it *sua sponte* halted defense counsel's cross-examination of the complainant regarding her reasons for not removing her child from the home the night of the incident in question where this line of questioning was relevant and the court's ruling prohibited counsel from highlighting the inconsistencies in the complainant's behavior and where the court gave its own explanation for the conduct?
>
> [II.] Did the trial court commit an abuse of discretion and/or error of law when it permitted the Commonwealth, over objection, to ask the ER doctor his opinion as to whether the injuries were "consistent with a punch", when in fact the doctor had been called as a fact witness, rather than an expert witness?
>
> [III.] Did the trial court commit an abuse of discretion and/or error of law when it permitted the complainant to testify about statements Appellant made to a third party ("he told my mom he pushed me"), as this violated the hearsay rule?
>
> [IV.] Did the trial court commit an abuse of discretion and/or error of law when it allowed the Commonwealth to elicit from Detective Shollenburger, over objection, information concerning decisions to charge in other criminal cases, as this was irrelevant and an impermissible effort to bolster the complainant's story and where the defense was foreclosed from a similar line of inquiry?
>
> [V.] Did the trial court commit an abuse of discretion and/or error of law when it permitted the Commonwealth to introduce the fact that the complainant filed a [protection from abuse ("PFA")], as the Commonwealth had failed to comply with the notice requirements under Pa.R.E. 404(b), when the fact was irrelevant,

---

[2] We have explained:

> Our standard of review over evidentiary rulings requires us to determine whether the trial court abused its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Henkel*, 938 A.2d 433, 440 (Pa. Super. 2007) (internal citations omitted), *appeal denied*, 955 A.2d 356 (Pa. 2008).

and when the prejudicial effect outweighed any probative value it may have had?

Appellant's Brief at 9.

After careful review of the record and the relevant case law, we conclude that the trial court accurately and thoroughly addressed the merits of Appellant's issues on appeal. *See* Trial Court Opinion, 5/23/19 at 10-23. With respect to Appellant's first issue, the trial court explained:

> Appellant was not limited in the scope of the cross-examination. The [c]ourt merely exercised its discretion in limiting speculation regarding the parties' custody order, which it deemed irrelevant to Appellant's charges. The custody order did not establish a material fact in the case, tend to make a fact more or less probable, or support a reasonable inference or presumption regarding a material fact. No error occurred in limiting Appellant's cross-examination. . . .
>
> Assuming *arguendo* it was error to limit the cross-examination regarding the victim not removing the child from the household on the night in question, it was harmless error. Appellant was given wide latitude in questioning Ms. Zimmer about her reasons for staying in the home after the incident and her reasons for not removing the child, presumably to imply she did not feel Appellant was a danger. Appellant was not limited in any other manner in cross-examination. The jury was free to believe any of the testimony regarding the night in question and substantial evidence existed to support Appellant's conviction. The limits placed on Appellant's cross-examination regarding speculation about the custody order could not have contributed to the verdict. No prejudice occurred and Appellant's claim must be dismissed.

*Id.* at 13. The trial court also found without merit Appellant's second issue. The court explained:

> Dr. Sangl's testimony regarding whether the injury was consistent with a punch to the jaw was rationally based on his on his personal experience as an ER physician. The testimony helped explain a possible way a jaw could be broken and did not rely on scientific, technical or specialized knowledge. The [c]ourt explicitly asked whether Dr. Sangl was expressing an opinion on causation and Dr. Sangl answered negatively.

*Id.* at 15.

In rejecting Appellant's third issue regarding the statement Appellant made to Ms. Zimmer's mother, the trial court aptly reasoned that any statements that Appellant made to Ms. Zimmer are admissible if the statements are relevant, regardless of whether Appellant "chooses to testify or not." *Id.* at 21. The trial court further noted that Appellant did not seek clarification surrounding the circumstances in which Appellant made the statement to Ms. Zimmer's mother. Specifically, Appellant did not ask Ms. Zimmer whether she was present when Appellant made the statement to her mother. The trial court explained:

> If in fact Ms Zimmer was not present during the conversation between Appellant and her mother, the alleged statement may have been inadmissible hearsay; however, even if it was error for the [c]ourt to overrule the objection, any error was harmless. The comment was elicited during vigorous cross-examination in which Appellant's counsel was accusing Ms. Zimmer of lying. Ms. Zimmer responded defensively to the accusation. The jury was free to believe any of the testimony regarding the night in question and the contradicting stories told by Ms. Zimmer. The single sentence, "[he told my mom he pushed me" with no further context could not have possibly contributed to the verdict. In fact, the jury was hung regarding the charges of [a]ggravated [a]ssault. The other substantial and uncontroverted evidence of Appellant's guilt for the remaining charges he was convicted of was so overwhelming and the prejudicial effect of any error was so insignificant by comparison that admission of the single statement could not have contributed to the verdict.

*Id.* The trial court rejected as without merit Appellant's fourth issue. In this case, approximately two and one-half weeks elapsed since the incident at issue when Ms. Zimmer reported the incident to the police. As a result, the Commonwealth, over Appellant's objection, questioned Detective Shollenberger about charging decisions in other criminal cases where there

was a delay in reporting crimes.  In support of its ruling, the trial court

reasoned:

> The decision to permit the Commonwealth some latitude in establishing the timeline between the crime and the report was within the [c]ourt's discretion.  The [c]ourt did not misapply the law, exercise manifestly unreasonable judgment, and did not exercise its judgment for reasons of partiality, prejudice, bias or ill-will.  Further, before the question was posed, the court did not know whether the Detective's answers regarding charging decisions would be relevant and therefore admissible.  As soon as the Commonwealth's questions began to venture into irrelevance, the [c]ourt immediately stopped the line of questioning.
>
> Assuming *arguendo* it was error to allow the Commonwealth to question Detective Shollenburger regarding whether it was common for a delay in charging in other cases, it was harmless error.  The [c]ourt made it very clear that the Detective's decision to charge or not was not evidence in the case.  The only testimony given by the Detective was that he had never filed charges so late after a domestic assault but had in other cases.  This testimony could not have contributed to the verdict; in fact, the testimony could have helped Appellant's case as it supported his argument regarding the delay in Ms. Zimmer's reporting of the crime.

*Id.* at 23.  Finally, the trial court also rejected Appellant's argument that it

had abused its discretion in allowing the Commonwealth to introduce, without

providing a notice to Appellant under Rule 404(b), the fact that Ms. Zimmer

had filed a PFA petition against him.  The trial court explained:

> The admission of the ***singular reference*** to the fact that Ms. Zimmer filed a PFA, without further reference to whether or not it was granted or violated, was not in error.  The [c]ourt set a very strict limit on when and how the information could be presented, *i.e.*, on rebuttal and limited to the fact it was simply filed, and instructed the jury the filing of a PFA was not determinative of the events of the night in question.  The [c]ourt refused to admit the supporting documentation showing the PFA was in fact granted as well as Appellant's guilty plea to the violation[.]  [The court ruled that the Commonwealth's motion seeking to introduce into evidence that Ms. Zimmer obtained a PFA against Appellant after the incident and his subsequent violation of the PFA order] was untimely and the evidence had minimal probative value.  No error occurred in allowing the limited reference to the fact that Ms. Zimmer filed a PFA.

*Id.* at 20 (emphasis added). Accordingly, in light of our standard of review, we cannot conclude that the trial court abused its discretion rendering evidentiary rulings unfavorable to Appellant. We, therefore, affirm the trial court's December 17, 2018 judgment of sentence. We further direct that a copy of the trial court's May 23, 2019 opinion be attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/13/2020

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
                                : OF ERIE COUNTY, PENNSYLVANIA
                                :
              v.                : CRIMINAL DIVISION
                                :
JUSTIN SCOTT MYERS              : NO. 1453 OF 2018

## OPINION

This matter is before the Court on Appellant's 1925(b) Concise Statement of Matters Complained of on Appeal. For the reasons set forth below, the judgment of sentence should be affirmed.[1]

## FACTUAL BACKGROUND

Appellant and the victim, Nicole Zimmer (Ms. Zimmer), were in an intimate relationship from approximately December 2015 through February 2018. *Transcript of Proceedings, Day 1, November 5, 2018 (Tr. Day 1) pp. 35-36.* During their relationship the parties lived together and had a child. *Id.* Appellant and Ms. Zimmer broke up in approximately February 2018 at which time Ms. Zimmer moved out of the couple's home and in with her parents. *Tr. Day 1, p. 36.* The parties began sharing custody of the minor child pursuant to a Custody Order. *Tr. Day 1, p. 74.*

On the evening of March 20, 2018, the child was at Appellant's home according to the custody schedule. Appellant and Ms. Zimmer, trying to work things out, made plans for Ms. Zimmer to come to the home and spend time together as a family until the child went to bed and then the adults would watch movies. *Tr. Day 1, pp. 36-37.* Appellant and Ms. Zimmer put the child to bed around 8:00 p.m. and stayed up drinking beer and watching movies late into the night. *Tr. Day 1, pp. 37-38.* Ms. Zimmer had approximately four or five Labatt Blues over the

---

[1] The Honorable John Garhart presided at the jury trial and was the sentencing judge. Due to the recent retirement of Judge Garhart, this matter was reassigned to the undersigned for preparation of the 1925(a) Opinion.

1



COMMONWEALTH'S
EXHIBIT

course of the night. *Tr. Day 1, pp. 38-39.* Ms. Zimmer did not know how much Appellant had had to drink. *Tr. Day 1, p. 39.*

After the third movie, Appellant looked at Ms. Zimmer and said, "That's why you slept with my brother." *Tr. Day 1, p. 39.* At first Ms. Zimmer thought Appellant was joking but he began to get angry and screamed at her. *Tr. Day 1, pp. 39.* Appellant threw an open beer can, hitting Ms. Zimmer and leaving a bruise on her chest. *Tr. Day 1, p. 40.* Ms. Zimmer left the room to clean herself off and Appellant walked toward her screaming. *Tr. Day 1, pp. 41-42.* Appellant pinned Ms. Zimmer's back against the hallway wall, grabbed her around her neck, and squeezed. *Tr. Day 1, p. 42-43.* Ms. Zimmer could not breathe or escape from Appellant's grip. *Tr. Day 1, pp. 43-45.* Right before Ms. Zimmer lost consciousness, Appellant released her and she collapsed on the floor. *Tr. Day 1, pp. 44-45.* Appellant then grabbed Ms. Zimmer by her ankles, drug her to the front door, and threw her outside. *Tr. Day 1, p. 45.*

After a few minutes, Ms. Zimmer reentered the house to retrieve her purse, phone and car keys and then left the premises. *Tr. Day 1, pp. 45-46.* Appellant began texting Ms. Zimmer apologizing and asking her to come back to talk. *Tr. Day 1, p. 46-47.* Ms. Zimmer returned to the home. *Tr. Day 1, p. 47.* Appellant had calmed down and the parties talked for ten to twenty minutes. *Tr. Day 1, pp. 47-48.* Suddenly, Appellant became agitated again and left the property. *Tr. Day 1, p. 48.* When Appellant didn't return after some time, Ms. Zimmer became worried and attempted to call his cell phone. *Id.* When she called his phone number, Ms. Zimmer noticed Appellant's cell phone lighting up from the bedroom floor. *Id.* Ms. Zimmer picked up the phone and looked at it, and found messages from other girls. *Id.*

When Appellant finally returned home, Ms. Zimmer confronted him about the messages from other girls. *Tr. Day 1, pp. 48-49.* The couple began arguing again and Appellant threw Ms.

2

Zimmer's keys down the hallway where they shattered, and smashed her cell phone. *Tr. Day 1, p. 49.* Ms. Zimmer called Appellant a liar and slapped him. *Tr. Day 1, p. 54.* The next thing Ms. Zimmer remembered was waking up face-down on the floor with blood pouring out of her mouth and the feeling there was a hole in her mouth. *Tr. Day 1, pp. 54-55.* Ms. Zimmer went into the bathroom to look in the mirror and found her jaw was cracked. *Tr. Day 1, pp. 57-58.*

Appellant drove Ms. Zimmer to the emergency room. *Tr. Day 1, p. 58.* On the way to the hospital, Appellant told Ms. Zimmer they needed to make up a story of what had happened and instructed her to say she fell down the steps. *Tr. Day 1, p. 59.* Appellant accompanied Ms. Zimmer in the examination room and when the physician asked her what had happened she complied with the made up story. *Tr. Day 1, pp. 59-60.* The physicians at the emergency room confirmed Ms. Zimmer's jaw had been broken. *Tr. Day 1, pp. 60-61.* Ms. Zimmer was sent to a specialist in Pittsburgh for surgery where metal plates were screwed into her jawbone and her jaw was wired shut to heal. *Tr. Day 1, pp. 60-65.*

Ms. Zimmer reported the incident to the Millcreek Police Department on April 3, 2018. *Tr. Day 1, p. 73; Transcript of Proceedings, Day 2, November 6, 2018 (Tr. Day 2) pp. 46-47.* Appellant was charged with Aggravated Assault, Strangulation, Recklessly Endangering Another Person, two counts of Simple Assault, two counts of Harassment, and Criminal Mischief.[2]

On November 7, 2018, following a two-day jury trial, Appellant was convicted of: Strangulation, Recklessly Endangering Another Person, Harassment (strike and/or shove and/or

---

[2] 18 Pa.C.S.A. § 2702(a)(1); 18 Pa.C.S.A. § 2718(a)(1); 18 Pa.C.S.A. § 2705; 18 Pa.C.S.A. § 2701(a)(1); 18 Pa.C.S.A. § 2701(a)(1); 18 Pa.C.S.A. § 2709(a)(1); 18 Pa.C.S.A. § 2709(a)(1); and 18 Pa.C.S.A. § 3304(a)(5), respectively.

kick), Harassment (choke), and Criminal Mischief.[3] The Court declared a hung jury as to the Aggravated Assault.[4]

On December 17, 2018, Appellant was sentenced to an aggregate period of 40 months to 10 years as follows:

Count Two - Strangulation: 40 months to 10 years of incarceration.

Count Three – Recklessly Endangering Another Person: 12 months to 24 months of incarceration, concurrent to Count Two.

Count Six – Harassment (strike/shove/kick): 45 days to 90 days of incarceration, concurrent to Count Three.

Count Seven – Harassment (choke): 45 days to 90 days of incarceration, concurrent to Count Three.

Count Eight – Criminal Mischief: 45 days to 90 days of incarceration, concurrent to Count Three.

On December 27, 2018, Appellant filed a Motion to Reconsider and Modify Sentence. The Commonwealth filed a Response to Motion to Reconsider and Modify Sentence. The Court denied the post-sentence motion on January 3, 2019. On February 1, 2019, Appellant filed a Notice of Appeal. On February 6, 2019, the Court directed Appellant to file a 1925(b) Statement of Matters Complained of on Appeal within 21 days. Appellant filed a Statement of Matters Complained of on Appeal on April 10, 2019.[5]

---

[3] 18 Pa.C.S.A. § 2718(a)(1); 18 Pa.C.S.A. § 2705; 18 Pa.C.S.A. § 2709(a)(1); 18 Pa.C.S.A. § 2709(a)(1); and 18 Pa.C.S.A. § 3304(a)(5), respectively.

[4] The charges for Aggravated Assault have been re-filed and disposition is currently pending.

[5] Appellant filed a Motion for Extension of Time to file Concise Statement on February 25, 2019. By Order of February 26, 2019, Appellant was granted until March 20, 2019 to file a Concise Statement. Appellant filed a Motion for Extension of Time to file Concise Statement (Second) on March 19, 2019. By Order of March 19, 2019, Appellant was granted until April 10, 2019 to file a Concise Statement.

4

Paraphrased, Appellant's Statement of Matters Complained of on Appeal identifies the following issues:

I.    Whether the Court abused its discretion in fashioning the sentence; and

II.   Whether evidentiary error occurred in:

1)    limiting testimony regarding the victim's actions regarding the parties' child on the night in question;

2)    permitting testimony from the emergency room physician regarding his observations about the injuries;

3)    permitting the victim to testify about filing a PFA against Appellant;

4)    permitting statements allegedly made by Appellant to the victim's mother; and

5)    permitting testimony from the detective regarding the timing of filing criminal reports.

See *1925(b) Statement*, ¶¶ *1-6*. The issues will be addressed ad seriatim.


## DISCUSSION

**I.    Sentencing Claim**

Appellant claims the Court abused its discretion in fashioning a sentence because: a) "the Court made inferences about . . . [Appellant's] prior conviction for Simple Assault by Mutual Affray without inadequate and/or limited evidence of record to support those inferences," and b) "the Court incorrectly emphasized that [Appellant] 'broke the Complainant's jaw' when . . . the jury did not convict" on that Count. *1925(b) Statement*, ¶ *1*.

Appellant's sentencing claim is factually inaccurate and belied by the record. Further, Appellant's claim of error is without merit. Assuming *arguendo* error occurred, it was harmless error.

5

"Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa. Super. 2011). For any challenge to the discretionary aspects of a sentence, the threshold inquiry is whether Appellant has raised a "substantial question" permitting appellate review. *Commonwealth v. Maneval*, 688 A.2d 1198 (Pa. Super. 1997). A claim that impermissible factors were considered raises a substantial question. *Commonwealth v. Simpson*, 829 A.2d 334 (Pa. Super. 2003).

The law on sentencing is well-settled:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. To constitute an abuse of discretion, the sentence imposed must either exceed the statutory limits or be manifestly excessive. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa. Super. 2003) (citations omitted).

A sentencing court is required to place on the record its reasons for imposition of sentence. 42 Pa.C.S.A. §9721(b). The sentencing judge can satisfy this requirement by identifying on the record that he was informed by a presentence report. *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988); *Commonwealth v. Pennington*, 751 A.2d 212, 217 (Pa. Super. 2000). Where the sentencing court has the benefit of a pre-sentence report, the law presumes that the court was aware of the relevant information regarding the appellant's character and weighed those considerations along with the mitigating statutory factors delineated in the Sentencing Code. *Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 545 (Pa. Super. 1995) (quoting *Commonwealth v. Devers*, 546 A.2d at 18; *Commonwealth v. Sanders*, 627 A.2d 183, 188 (Pa. Super. 1993). The court may consider prior arrests which did not result in conviction as

6

long as the court recognizes the defendant was not convicted of the charges. *Commonwealth v. Fries*, 523 A.2d 1134, 1136 (Pa. Super. 1987).

A sentence may be vacated only where it "reasonably appears from the record the trial court *relied* in whole or in part" upon an impermissible factor. *Commonwealth v. Smithton*, 631 A.2d 1053, 1056–57 (Pa. Super. 1993)(emphasis in original). Consideration of an impermissible factor is not *ipso facto* a basis for relief. "Even if a sentencing court relies on a factor that should have not been considered, there is no abuse of discretion when the sentencing court has significant other support for its departure from the sentencing guidelines." *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa. Super. 2008), citing *Commonwealth v. Smith*, 673 A.2d 893, 896-897 (Pa. 1996); *Commonwealth v. PLS*, 894 A.2d 120, 133 (Pa. Super. 2006).

Here, Appellant's claim the Court relied upon the impermissible factors of Appellant's prior conviction for Mutual Affray or the fact that the victim's jaw was broken is factually inaccurate and belied by the record. At sentencing, the following exchange occurred:

> THE COURT: . . . Now, supporters out there of your client; I got a number of letters. Are there people here on his behalf?
>
> MR. HACKWELDER: There are two.
>
> THE COURT: Raise your hand. Okay. And the family says, look, hard worker, out of character – although, I put a question mark over that – other good characteristics, relationship gone bad. What would you say, Attorney Hackwelder?
>
> MR. HACKWELDER: I would agree with that. I can explain the question mark. I understand where you probably have a question mark in the prior record.
>
> THE COURT: Yep. This is the second broken jaw he's charged with. **Although I want to be quick to acknowledge he wasn't convicted of that.**
>
> MR. HACKWELDER: No. And with the other one in the prior record, Judge, it was – he did plead to a mutual affray in that case.

7

THE COURT: He did. But the long and short of it is, twice in his life hanging over his head is someone with a broken jaw.

MR. HACKWELDER: I understand, Judge, but in this case --

THE COURT: **Well, he just doesn't look like the peaceable person that the family wants to paint him as. I'm not saying he's guilty of those offenses, but I'm saying that when the family says he's peaceable, they seem to ignore the contrary evidence.** I know they're partisans, but I'm not.

MR. HACKWELDER: I understand, Judge. And I understand how it looks. I do. But I do believe that that's merely a coincidence. I do.

THE COURT: In most people's entire life, they never even strike another human being, nor are they ever close to two broken jaws regardless of culpability. And we can agree with something else; whatever the legality of what he did is both broken jaws resulted from the impact of his fist to someone's jaw.

MR MYERS: Your Honor, I never hit her.

MR. HACKWELDER: Hold on. Yeah. I don't think the allegations in this case were a fist to the face.

THE COURT: Well, I agree. **That's fair. The jury didn't find beyond a reasonable doubt that he did it because she said she fell down the steps and that was her initial story. On the other hand, they didn't find the Defendant didn't do it either, but he's not required – right now he stands under the presumption of innocence for that.**

*Sentencing Transcript, December 17, 2018 (Sent. Tr.), pp. 6-8* (emphasis added).

The record is clear that while the Court referenced the prior conviction and the fact that Appellant had broken someone's jaw before, the reference was in response to the portrayal of Appellant as a peaceable person and not a part of the Court's final disposition of the case. In fact, when making the observation that Appellant's history was contrary to the family's assertion that Appellant was peaceable, the Court noted twice that Appellant was not convicted of breaking the victim's jaw and he had the presumption of innocence in that regard. The Court did not rely on Appellant's prior conviction for Mutual Affray or Appellant's history of breaking jaws when fashioning the sentence.

8

Further, in imposing the sentence, the Court clearly stated its considerations on the record. Specifically:

> THE COURT: . . . I've considered the Pennsylvania Sentencing Code, the Presentence Report, the sentencing memorandums and letters on behalf of the Defendant. I presided over the trial. And after seriously consulting my memory banks, the vast majority of it came back to me.
>
> I've listened to the statement of the Defendant, his counsel, the attorney for the Commonwealth. I've looked at the Defendant, his age, his background, his character, his rehabilitative needs, the nature and the circumstances of this offense and the protection of the community.
>
> **And I'm mindful of the fact that the jury did not convict the Defendant of aggravated assault . . .**
>
> On the other hand, the Defendant, after a fair trial, was convicted of strangulation, a felony of the second degree; recklessly endangering another person; and two counts of harassment by me.
>
> . . .
>
> 2, I'm going to impose jail time at the strangulation count. The standard range is 40 to 60 months. I'm not going to impose that; I'm going to go below it . . . I believe that this 10-year-old aggravated assault, which largely drives the prior record score, makes it higher than it is so I take that off one side of the equation
>
> But I add back on, in my evaluation of the Defendant, what I consider to be behavior beyond the [pale], and that is breaking his PFAs after this event occurs; I won't tolerate that.
>
> So all things considered in a complex situation and in a complex evening, if someone takes the time to read the transcript, I'm going to impose a sentence of 40 months, which is still a long time. It's above the mitigated range; it's below the standard range. And that's at Count 2, strangulation . . . at Count 3, recklessly endangering where the recommended sentence is six to 12, I'm going to impose a sentence of one to two years, but I'm going to make it concurrent and underlapping with Count [2] because the harm here the Defendant postured and the need to protect society is covered at that sentence . . .

*Sent. Tr., pp. 15-17.*

9

Contrary to Appellant's assertion, it is clear the Court did not consider impermissible factors when determining Appellant's sentence. The Court reviewed and considered the pre-sentence investigation report. As stated on the record, the Court considered the facts of the case, Appellant's age, background, character and rehabilitative needs. The Court recognized Appellant's prior record score was inflated due to older charges and adjusted the sentence accordingly. The Court appropriately balanced all of the factors against the facts of the crime, including the fact that Appellant violated a PFA between himself and the victim after the crime. Taking all of the factors into consideration, the Court fashioned a sentence which by any standard should be regarded as lenient. The Court offered significant support for the imposition of the sentence. Appellant's claim the Court relied upon impermissible factors is meritless and must be dismissed.

## II.    Claims of Evidentiary Error

Appellant makes multiple claims of evidentiary error regarding the Court's rulings on the admissibility of specific testimony from various individuals throughout the course of the trial. See *1925(b) Statement, ¶¶ 2, 3, 5, and 6.* Appellant's claims are meritless.

### A. Relevant Legal Principles

The admissibility of evidence rests within the sound discretion of the trial court and its decision will only be reversed if the court's conclusion "overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Bryant*, 67 A.3d 716, 726 (Pa. 2013).

Except as otherwise provided by law, all relevant evidence is admissible. Pa.R.E. 402.

> The threshold inquiry with admission of evidence is whether the evidence is relevant. Evidence is relevant if it logically tends to establish a material fact in

10

the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact.

*Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa. Super. 2013) (internal citations and quotation marks omitted). Evidence is not unfairly prejudicial simply because it may be harmful to the defendant's case. *Id.*

In the event of an erroneous admission of evidence, a verdict will not be overturned if the error was harmless. *Commonwealth v. Poplawski*, 130 A.3d 697, 716 (Pa. 2015), *citations omitted.* An error is harmless where (1) there was no prejudice to the defendant or the prejudice was *de minimus;* (2) the evidence was merely cumulative of the other substantially similar untainted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Poplawski,* 130 A.3d at 716.

## 1.  Limiting cross-examination regarding the victim's reasons for not removing the parties' child.

First, Appellant claims it was error when the Court "*sua sponte* interrupted/halted . . . cross-examination . . . regarding [Ms. Zimmer's] reasons for not removing her child from the home on the night of the incident" and to "introduce its own explanation" for such conduct. Appellant claims error occurred because "this line of questioning . . . was relevant to the case" and would highlight the inconsistencies in the victim's behavior. *1925(b) Statement,* ¶ 2.

Appellant's claim is factually inaccurate and belied by the record. Further, Appellant's claim is without merit. Assuming *arguendo* error occurred, it was harmless error.

11

It is within the discretion of the trial court to determine the scope and limits of cross-examination. *Commonwealth v. Nolen*, 634 A.2d 192 (Pa. 1993). Even if a court errs in limiting cross-examination, the error will be deemed harmless if the error could not have contributed to the verdict. *Commonwealth v. Nolen*, 634 A.2d at 196.

At the outset, Appellant's claim is factually inaccurate, as the Court did not entirely halt Appellant's cross-examination. Contrary to Appellant's assertion, at trial Appellant was afforded significant leeway in questioning the victim about the events of the night in question and her concern for the child. It was only when Appellant began questioning why the victim did not remove the child from the home in violation of the custody order that the Court intervened with an explanation to the jury regarding custody orders:

> THE COURT: Ladies and Gentlemen, it's not clear to me, without court intervention, she'd have any right to take that child, if the custody order provided it was with the father. So the suggestion by counsel that she should be faulted for not taking the child seems to me a wide remark.
>
> If it's his night, Attorney Kelley, that's the end of it until a judge rules. Otherwise, it would open up Pandora's box every custody order in town. So move on.

*Tr. Day 2, p. 24.* Subsequently, Appellant was permitted to continue questioning Ms. Zimmer about the night in question, including her concern for the child. It was not until Appellant pressed Ms. Zimmer to speculate on what kind of trouble she could have gotten into for violating the custody order that the Court stopped the line of questioning as irrelevant:

> MR. KELLEY: Is it your testimony now that you stayed because of the custody order?
>
> WITNESS: What do you mean? I don't know understand [sic] what you're asking me.
>
> MR. KELLEY: The judge has introduced an issue about you complying with the terms of the custody order.

12

WITNESS: It was his night, it was his day, and if I tried to take my son from him, then I could get in trouble for that.

MR. KELLEY: Okay, do you know what that trouble – do you know the form that could take?

THE COURT: We're not going to try a custody dispute in the context of this.

MR. KELLEY: Judge, frankly, I find this to be very probative.

THE COURT: No, we're not going to try a custody dispute about what she should have done with the kid. The question is what happened that night. She didn't take the kid. You're not going to put her on trial for not taking the child. Not fair. Move on.

*Tr. Day 2, p. 28.*

Appellant was not limited in the scope of the cross-examination. The Court merely exercised its discretion in limiting speculation regarding the parties' custody order, which it deemed irrelevant to Appellant's charges. The custody order did not establish a material fact in the case, tend to make a fact more or less probable, or support a reasonable inference or presumption regarding a material fact. No error occurred in limiting Appellant's cross-examination. The claim is meritless and must be dismissed.

Assuming *arguendo* it was error to limit the cross-examination regarding the victim not removing the child from the household on the night in question, it was harmless error. Appellant was given wide latitude in questioning Ms. Zimmer about her reasons for staying in the home after the incident and her reasons for not removing the child, presumably to imply she did not feel Appellant was a danger. Appellant was not limited in any other manner in cross-examination. The jury was free to believe any of the testimony regarding the night in question and substantial evidence existed to support Appellant's conviction. The limits placed on Appellant's cross-examination regarding speculation about the custody order could not have contributed to the verdict. No prejudice occurred and Appellant's claim must be dismissed.

13

**2.    Permitting the emergency room physician to testify as to whether the victim's injury was consistent with a punch to the jaw.**

Second, Appellant claims it was error to permit the treating emergency room physician to answer whether the victim's injury was consistent with a punch to the jaw. Appellant claims error occurred because "the doctor had been called as a fact witness, rather than an expert witness." *1925(b) Statement,* ¶ *3.* Appellant's claim is wholly without merit. Assuming *arguendo* error occurred, it was harmless error.

Pennsylvania Rules of Evidence Rule 701 provides a witness not testifying as an expert may only offer opinion evidence that is (a) rationally based on the witness's perception; (b) helpful to clearly understand the testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge. *Pa.R.E. 701.* A lay witness "may state relevant facts known to him, because of experience, even though he is not regarded as an expert whose opinion would be admissible on a hypothetical inquiry." *Commonwealth v. Bennett,* 370 A.2d 373 (Pa. 1977).

The Commonwealth conducted direct examination of Dr. John David Sangl, the physician who treated Ms. Zimmer in the emergency room on the night in question:

> MS. ANGLIN: And, Doctor, you testified that in emergency care you see injuries and illnesses of all sorts, right?
>
> DR. SANGL: Yes.
>
> MS. ANGLIN: Do those injuries include victims of assault?
>
> DR. SANGL: Absolutely.
>
> MS. ANGLIN: For a broken jaw, is that a common result --
>
> MR. KELLEY: Objection. Objection, this is a fact witness, Your Honor. He's not an expert.
>
> THE COURT: I agree. You want him to testify his opinion about the likely cause of this?

14

MS. ANGLIN: I would like him to testify whether the observations that he made would be consistent with that type of conduct?

THE COURT: What?

MS. ANGLIN: With a punch.

THE COURT: With a punch. You can ask him that.

MR. KELLEY: That's the objection, Your Honor.

THE COURT: No it's not. She's asking whether it's consistent. **She's not asking him to state his opinion abont what was the canse. She's simply saying she's going to ask him whether a punch was consistent with the injury he saw.** Go ahead.

MS. ANGLIN: So, Doctor, given the injuries that you observed on Nicole Zimmer on March 31st (sic), is that consistent with a punch to the face?

DR. SANGL: Yes. On March 21st. Someone can fracture a jaw from a punch, yes.

MS. ANGLIN: That's all I have, Judge.

THE COURT: **Yon're not expressing any opinion abont what cansed the fractnre, right?**

DR. SANGL: That's right. I only know what I was told.

*Tr. Day 2, pp. 75-76* (emphasis added).

Here, Dr. Sangl's testimony regarding whether the injury was consistent with a punch to the jaw was rationally based on his on his personal experience as an ER physician. The testimony helped explain a possible way a jaw could be broken and did not rely on scientific, technical or specialized knowledge. The Court explicitly asked whether Dr. Sangl was expressing an opinion on causation and Dr. Sangl answered negatively. No error occurred in the admission of the testimony.

Assuming *arguendo* it was error to permit the treating emergency room physician to testify if the injury was consistent with a punch to the jaw, it was harmless error. Appellant's cross-examination went well beyond the single question regarding a consistent injury posed by

15

the Commonwealth. Appellant's counsel proceeded to freely probe alternate causes of jaw fractures, eliciting opinions from Dr. Sangl regarding potential causes such as falling and hitting a chin on a nightstand or running into a wall. *Tr. Day 2, p. 76-77*. Therefore, no prejudice occurred in permitting the physician to answer the Commonwealth's general question and Appellant's claim must be dismissed.

### 3. Permitting the victim to testify she filed a PFA against Appellant

Third, Appellant claims it was error to permit the Commonwealth to introduce the fact the victim had filed a PFA against Appellant, because the Commonwealth "failed to comply with notice requirements under Pa.R.E. 404(b), the fact was irrelevant, and the prejudicial effect outweighed any probative value." *1925(b) Statement, ¶ 4*. Appellant's claim is without merit. Assuming *arguendo* error occurred, it was harmless error.

Pennsylvania Rule of Evidence 404 provides, in part:

**(b) Crimes, Wrongs or Other Acts.**

. . .

*(2) Permitted Uses.* [Evidence of a crime, wrong, or other act] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.
*(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

*Pa.R.E. 404(b.)*

Specifically, the Pennsylvania Supreme Court has held that PFA petitions are admissible and relevant to demonstrate the continual nature of abuse and to show the defendant's motive, malice, intent, and ill-will toward the victim. *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016), citing *Commonwealth v. Drumheller*, 808 A.2d 893, 905 (Pa. 2002).

16

In the present case, the Commonwealth filed a Motion seeking to introduce that Ms. Zimmer obtained a Protection from Abuse (PFA) against Appellant after the crime, as well as Appellant's violation of the PFA, pursuant to Pa.R.E. 404(b). The Motion was not filed until November 6, 2018, the second day of trial.

The Court met with counsel in chambers prior to the commencement of the second day's proceedings to discuss the Motion. Regarding the PFA, the Commonwealth asked to introduce the PFA complaint and the ICC complaint in response to cross-examination regarding Ms. Zimmer's continued contact with Appellant. See *Tr. Day 2, pp. 3-9* . The Court noted Appellant's opening statement had contained the theme of an ongoing relationship, and if Appellant opened the door during cross-examination the evidence of the PFA may be admissible to demonstrate when Ms. Zimmer took a fixed and firm position. *Tr. Day 2, pp. 6-7.* Appellant raised an issue regarding the late notice of the 404(b) evidence. The Court directed the Commonwealth to produce copies of the documents and reserved its ruling on the admission of the documents until it could review the supporting documents. See *Tr. Day 2, pp. 3-9; pp 12-15.* Specifically, the Court stated:

> THE COURT: A little bit on this motion to admit 404(b) evidence. First of all, the prosecution needs to get the DA's office to get in the hands of my clerk, one, the PFA itself, and two, the ICC complaint. I can't rule without looking at it. I want to see those documents and see – if you don't have it and you should have it, the transcript of exactly what he said at the time of the plea. Get those to my clerk. I'm simply reserving on this. If it comes in, it would come in as rebuttal evidence. I'm not letting it in right now in the case in chief. So you might get a rebuttal but we're going to move along with your case without it. You put me in this box and that's how I'm going to rule.
>
> Now, that doesn't mean you can't ask the defendant on cross examination, if it's within the scope, whether or not he did these things. That's a different matter. Okay.
>
> MS. ANGLIN: Okay.

17

THE COURT: And I'm not forbidding you from cross examining on it, but the documents aren't coming in on 404(b) unless I rule on it.

MS. ANGLIN: Thank you.

THE COURT: And, Attorney Kelley, I've noted your timeliness exception. I'll take a look at that.

MR. KELLEY: Thank you, Your Honor.

*Tr. Day 2, pp. 14-15.*

Later in the trial, after receiving the documents from the Commonwealth, the Court gave further instructions on the very limited way reference to the PFA could come in:

THE COURT: My view is she can ask this witness: Did you – when did she get the PFA?

MS. ANGLIN: April 4th.

THE COURT: If you also sought a protection from abuse order, period. Okay. I think that's the end of it for now. All right.

MR. KELLEY: Okay. Objection. I object to that under Rule 404(b).

THE COURT: My thought is she's been questioned about why she did what she did, and she's made a statement that eventually she overcame her fear, and so in order to show that that's a credible explanation, it's fair for the prosecution to how not only that she made a complaint to the police but she followed through with other remedies and sought a protection from abuse order, okay.

Now, I don't want to get into whether it was granted or not, because that would indicate someone thought there was something to it, and I don't want to get into the credibility, but I'm allowing that. I think the prejudicial effect is minimal here at this ruling, at this stage. We're done.

*Tr. Day 2, pp. 50-51.*

Per the Court's instructions, the Commonwealth presented the fact that a PFA was filed in a very limited capacity. The Court further followed up with instructions to the jury about the

18

very limited purpose the reference to a PFA filing served:

> MS. ANGLIN: And yes or no answer for this one, did you take any legal action to prevent the defendant from contacting you?
>
> MS. ZIMMER: Yes.
>
> THE COURT: You can develop what that was. Don't get into the complaint.
>
> MS. ANGLIN: Can you tell the jury exactly [what] that procedure was?
>
> THE COURT: Did you file for a PFA?
>
> MS. ZIMMER: Yes I filed for a PFA.
>
> . . .
>
> THE COURT: Ladies and gentleman, about this PFA. I only allow it – first of all, it doesn't determine what's true or not on this night in question. It's just to show when she made her complaint, she made a full complaint to the police and to seek, basically, an injunction preventing contact. I want you to have the whole picture. You need to understand that that filing doesn't settle the issue before you, in any way. You still have to decide what happened.

*Tr. Day 2, p. 62-63.* There was no further reference to the PFA presented to the jury.

Ultimately, the Court sustained Appellant's objection regarding the documentary evidence of the PFA and the subsequent ICC, finding the timeliness of the motion was an issue, as well as the minimal probative value the PFA and ICC complaints had to the charges against Appellant:

> THE COURT: . . . I'm not letting in the evidence of – any more evidence concerning the PFA and here's why. First, the motion was presented late.
>
> Number two, if I did let it in – number two, it has minimal probative value at this point. Whether he assaulted or not is the question. Did he call her later and try to get – perhaps, but that's not what this case is about. And if I let in her PFA statement and let the document in, since it wasn't introduced in your case in chief, Attorney Kelley would then have the right to recall her and go over whether everything she said in that document was consistent. It invites a lot of mess. So the ruling of the Court is, for all these reasons, potential confusion, probative value is minimal, it's excluded.

*Tr. Day 2, p. 103.*

19

The admission of the singular reference to the fact that Ms. Zimmer filed a PFA, without further reference to whether or not it was granted or violated, was not in error. The Court set a very strict limit on when and how the information could be presented, i.e., on rebuttal and limited to the fact it was simply filed, and instructed the jury the filing of a PFA was not determinative of the events of the night in question. The Court refused to admit the supporting documentation showing the PFA was in fact granted as well as Appellant's guilty plea to the violation, ruling the Motion was untimely and the evidence had minimal probative value. No error occurred in allowing the limited reference to the fact that Ms. Zimmer filed a PFA. The claim is meritless and must be dismissed.

Assuming *arguendo* it was error to allow testimony that Ms. Zimmer merely filed a PFA, it was harmless error. As discussed above, the Court set very limited parameters about the information that was presented and allowed it for the limited purpose of rebuttal evidence to demonstrate how Ms. Zimmer overcame her fear of Appellant. No prejudice occurred to Appellant as no further information about the PFA was presented; even if the admission of the limited information was prejudicial, the amount of uncontroverted evidence of Appellant's guilt was so overwhelming any prejudice was insignificant by comparison and could not have contributed to the verdict. The claim must be dismissed.

### 4. Permitting the victim to testify regarding statements Appellant allegedly made to her mother.

Fourth, Appellant claims it was error to permit the victim to testify "[h]e told my mom he pushed me." Appellant claims error occurred because the statement violated the rule against hearsay evidence. *1925(b) Statement,* ¶ 5. Appellant's claim is meritless. Even if it was error to admit the statement, any error was harmless.

20

During cross-examination, the victim was questioned about the different stories she had told to different people and in response to a question, the victim stated Appellant had told lies as well and said specifically "[h]e told my mom he pushed me." *Tr. Day 2, p. 38.* Appellant raised an objection to the statement based on hearsay and the fact that Appellant was not going to testify. *Id.* The Court overruled the objection, noting any statements Appellant made to the victim "are absolutely and positively admissible if they're relevant to this case, whether or not he chooses to testify or not." *Id.* There was no further questioning about the circumstances of the statement, significantly whether Ms. Zimmer was also present when the alleged comment was made.

If in fact Ms. Zimmer was not present during the conversation between Appellant and her mother, the alleged statement may have been inadmissible hearsay; however, even if it was error for the Court to overrule the objection, any error was harmless. The comment was elicited during vigorous cross-examination in which Appellant's counsel was accusing Ms. Zimmer of lying. Ms. Zimmer responded defensively to the accusation. The jury was free to believe any of the testimony regarding the night in question and the contradicting stories told by Ms. Zimmer. The single sentence, "[h]e told my mom he pushed me" with no further context could not have possibly contributed to the verdict. *Tr. Day 2, p. 38.* In fact, the jury was hung regarding the charges of Aggravated Assault. The other substantial and uncontroverted evidence of Appellant's guilt for the remaining charges he was convicted of was so overwhelming and the prejudicial effect of any error was so insignificant by comparison that admission of the single statement could not have contributed to the verdict. No prejudice occurred and Appellant's claim must be dismissed.

21

## 5.    Permitting the Commonwealth to question the detective about the decision to file charges in other criminal cases.

Finally, Appellant claims it was error to permit the Commonwealth to "elicit from Detective Shollenberger . . . information concerning decisions to charge in other criminal cases." Appellant claims error occurred because it was irrelevant, an "impermissible effort to bolster the [victim's] story", and Appellant was "foreclosed from raising a similar line of inquiry." *1925(b) Statement, ¶ 6.* Appellant's claim is without merit. Assuming *arguendo* error occurred, it was harmless error.

The Commonwealth presented the testimony of Detective Shollenburger, the investigator on the case, regarding when the victim reported the crime. Due to the fact the report was made and the charges were filed approximately two and a half weeks after the incident, the Commonwealth asked whether this was common in other cases. Appellant objected, and the Court cautioned it would permit the question but watch how far the Commonwealth attempted to go:

> MS. ANGLIN: Have you filed other cases where reporting does not occur until weeks after the fact?
>
> MR. KELLEY: Objection, relevance.
>
> THE COURT: I'm going to allow it, but I'm going to watch how far we go. Go ahead.
>
> DETECTIVE: Not domestic assaults, but I have filed cases that have been reported a significant time after the violations had occurred.
>
> MS. ANGLIN: And given the evidence, what did you decide to charge?
>
> THE COURT: Now let me just stop you. Counsel, I don't think it's relevant, let me tell you why. Charges have been brought, right. He brought them. He's not the jury in this cases [sic], he's not the judge of this case. We know he brought the charges right after she came in. But what charges he brought are for you in the charging document, and whether those charges are proven or not is what this trial

22

is all about. So what he thinks of the charge, not relevant or admissible in this trial.

The question is, when everything is said and done, what are you thinking? Has the Commonwealth met its burden of proof? I'm not going to let him testify he thinks it's a good case, presuming that's what he's going to say because that ain't relevant here; what he thinks is not evidence. Go ahead.

*Tr. Day 2, pp. 90-91.*

The decision to permit the Commonwealth some latitude in establishing the timeline between the crime and the report was within the Court's discretion. The Court did not misapply the law, exercise manifestly unreasonable judgment, and did not exercise its judgment for reasons of partiality, prejudice, bias or ill-will. Further, before the question was posed, the Court did not know whether the Detective's answers regarding charging decisions would be relevant and therefore admissible. As soon as the Commonwealth's questions began to venture into irrelevance, the Court immediately stopped the line of questioning.

Assuming *arguendo* it was error to allow the Commonwealth to question Detective Shollenburger regarding whether it was common for a delay in charging in other cases, it was harmless error. The Court made it very clear that the Detective's decision to charge or not was not evidence in the case. *Tr. Day 2, pp. 90, lines 11-25; Tr. Day 2, pp. 91, line 1.* The only testimony given by the Detective was that he had never filed charges so late after a domestic assault but had in other cases. See *Tr. Day 2, pp. 90, lines 6-8.* This testimony could not have contributed to the verdict; in fact, the testimony could have helped Appellant's case as it supported Appellant's argument regarding the delay in Ms. Zimmer's reporting of the crime. No prejudice occurred and the claim must be dismissed.

23

## CONCLUSION

For the foregoing reasons, the judgment of sentence should be affirmed. The Clerk of

Courts is hereby directed to transmit the record to the Superior Court.


**BY THE COURT:**

Date: _May 23, 2019_

John J. Mead, Judge


CC: DA's Office

Jessica Fiscus, Esq. – PD's Office

Deanna Heasley, Esq. – Box 25